**Opinion issued May 7, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00523-CV

———————————

**LINDA S. NOWLIN, Appellant**

**V.**

**LORI KEATON, Appellee**

On Appeal from the County Court at Law No. 1
Travis County, Texas[1]
Trial Court Case No. C-1-CV-15-005936

## MEMORANDUM OPINION

Appellant, Linda S. Nowlin, challenges the trial court's judgment, rendered

after a jury trial, in favor of appellee, Lori Keaton, in Nowlin's suit against Keaton

---

[1] Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal to this Court. *See* Misc. Docket No. 17–9066 (Tex. June 20, 2017); *see also* TEX. GOV'T CODE ANN. § 73.001 (authorizing transfer of cases).

for breach of lease agreement and Keaton's countersuit against Nowlin for failure to refund security deposit,[2] retaliation,[3] and other violations of the Texas Property Code.[4]  In seven issues, Nowlin contends that the trial court erred in entering judgment in favor of Keaton on Nowlin's breach-of-lease-agreement claim, entering judgment in favor of Keaton on Keaton's counterclaims, and awarding Keaton attorney's fees.

We affirm.

## Background

In her amended petition, Nowlin alleged that on May 6, 2014, she purchased a house in Austin, Texas (the "property").  Prior to Nowlin's purchase, Keaton lived at the property pursuant to a lease agreement with the property's previous owner. Nowlin and Keaton executed a new lease agreement (the "lease agreement") when Nowlin purchased the property.

Nowlin further alleged that the lease agreement provided a lease term from May 6, 2014 until April 30, 2015 and required Keaton to pay $2,100 in rent each month.  Keaton was to make her rent payments by direct deposit on the first day of each month, with the exception of her May 2014 rent payment.  Keaton was not

---

[2]    *See* TEX. PROP. CODE ANN. §§ 92.103, 92.104.

[3]    *See id.* § 92.331.

[4]    *See id.* §§ 92.153(a)(3), (a)(5), 92.157(a)(2), 92.158.

required to pay a security deposit directly to Nowlin, but the $2,000 security deposit that Keaton had paid to the property's previous owner was transferred to Nowlin when she purchased the property. The lease agreement also required Keaton to pay a $1,785 reletting fee if she vacated the property under certain conditions before the end of the lease term.

Additionally, under the terms of the lease agreement, Keaton was to provide Nowlin with an inventory and condition form at the beginning of the lease term, and Keaton was liable and required to reimburse Nowlin for any expenses incurred in remedying damage to the property resulting from any cause other than Nowlin's own negligence or fault. The lease agreement also stated that Keaton was to promptly notify Nowlin, in writing, of any water leaks, mold, electrical problems, malfunctioning lights, broken or missing locks or latches, and other conditions that posed a hazard. Further, Keaton was responsible for cleaning the interior of the property and could be liable for reasonable cleaning charges.

In regard to termination of the lease agreement, Keaton was required to give thirty-days written notice before moving out of the property. Upon vacating the property, Keaton was liable for certain charges, including unpaid rent, certain repairs and damages, replacement of unreturned keys, and the reletting fee, all which could be deducted from Keaton's $2,000 security deposit. Nowlin was required to return, within thirty days of move out, Keaton's security deposit, less any lawful deductions.

3

Nowlin further alleged that on June 3, 2014, Keaton paid Nowlin rent, but failed to make any other rent payments thereafter. And Nowlin alleged that on September 5, 2014, without written notice and prior to the end of the lease term, Keaton moved out of the property without paying rent for the entire lease term, responding to a notice of abandonment, making her September rent payment, paying the $1,785 reletting fee, and cleaning the property.

After Keaton vacated the property, Nowlin discovered that the property had been damaged. Between September 18, 2014 and November 5, 2014, Nowlin made repairs to the property, which cost her $13,738. Nowlin also hired a professional cleaning service to clean the property. Nowlin did not return any portion of Keaton's security deposit.

According to Nowlin, after Keaton vacated the property, Nowlin "exercised reasonable diligence to mitigate [her] damages by repairing the damage to the property caused by [Keaton] in as prompt a manner as possible and then [by] seeking another tenant to" rent the property. Nowlin, however, did not find another tenant for the remaining portion of the lease term, and she received "no actual rent from any other tenant during that time period." Nowlin asserted a claim against Keaton for breach of lease agreement and sought $19,000 for unpaid rent, $13,738 for repairs to the property, $1,785 for the reletting fee, and attorney's fees.

In her third amended answer and counterclaims, Keaton generally denied the allegations in Nowlin's amended petition, asserting, *inter alia*, that Nowlin had breached the lease agreement first and waived Keaton's compliance with the lease agreement. Keaton also brought counterclaims against Nowlin, alleging that she began living at the property in 2011 under a lease agreement with the property's previous owner. Subsequently, she and Nowlin executed the lease agreement, which required Keaton to pay $2,100 in rent each month.

After Nowlin purchased the property in May 2014, she and/or her agents, repeatedly came to the property, oftentimes without proper notice and on holidays, to make repairs that were purportedly "to protect [Nowlin's] investment." Nowlin told Keaton that "she could enter [the property] whenever she wanted," and Nowlin told her contractors that they could leave their tools and materials in the property's garage. (Internal quotations omitted.) Nowlin also gave her contractors permission to use Keaton's tools to complete their work.

On May 14, 2014, Keaton "expressed to [Nowlin] that she was unaccustomed to and overwhelmed by" Nowlin's presence at the property and the presence of Nowlin's contractors at the property on an almost daily basis. On May 19, 2014, Keaton sent Nowlin a letter expressing her frustrations with the frequent intrusions. At that time, Keaton also requested that Nowlin install a keyless dead bolt lock on the property's front door. On May 24, 2014, Nowlin installed a "keyed" dead bolt

lock on the property's front door, stating that it was "keyless" because no key existed for the lock, despite there being "a clear keyhole on the exterior of the lock." (Internal quotations omitted.)

On June 11, 2014, Keaton notified Nowlin, by letter, that she had failed to provide her address as required by the Texas Property Code, she was continuing to access the property without providing proper notice, she had failed to install pin locks on the exterior sliding glass doors at the property, and she had failed to provide working handle latches for the exterior sliding glass doors. In her letter, Keaton requested the installation of pin locks, working handle latches, and security bars on the exterior sliding glass doors. On July 28, 2014, Keaton notified Nowlin by email that a keyless dead bolt lock still had not been installed on the property's front door and "there were no locks on the [property's exterior] sliding glass doors," and Keaton requested the installation of pin locks. According to Keaton, Nowlin did not provide pin locks or proper security bars for any of the exterior sliding glass doors, did not fix the inoperable handle latches that did not properly latch to secure the exterior sliding glass doors, and did not disclose her address as requested.

Keaton further alleged that after Nowlin purchased the property in May 2014, Nowlin served Keaton with three notices to vacate. The first notice to vacate, served on June 4, 2014 (the "June 4, 2014 notice to vacate"), stated that Keaton "had disturbed or threatened the rights, comfort, health, safety or convenience of others

6

and disrupted [Nowlin]'s business operations." The second notice to vacate, served on July 2, 2014 (the "July 2, 2104 notice to vacate"), stated that Keaton had failed to pay rent. Contrary to the July 2, 2014 notice to vacate, however, Keaton alleged that she had attempted to make her July rent payment by direct deposit, as required by the lease agreement, but Nowlin had instructed her bank not to accept Keaton's deposit. On September 4, 2014, Nowlin served Keaton with a third notice to vacate (the "September 4, 2014 notice to vacate"). The next day, Keaton told Nowlin that she was moving out of the property. Keaton asserted counterclaims against Nowlin for failure to refund security deposit, retaliation, and violations of Texas Property Code sections 92.153(a)(3), (a)(5), 92.157(a)(2), and 92.158.

In regard to her counterclaim for failure to refund security deposit, Keaton alleged that Nowlin refused, in bad faith, to return Keaton's $2,000 security deposit or provide Keaton with a proper itemized accounting after Keaton had vacated the property and provided written notice of her forwarding address.[5] Keaton sought $6,100 in damages, "which represent[ed] the statutory penalty of $100 plus three times the portion of the security deposit withheld by" Nowlin, and attorney's fees.[6]

---

[5]     *See id.* §§ 92.103 (obligation to refund security deposit), 92.104 (retention of security deposit and accounting).

[6]     *See id.* § 92.109(a) ("A landlord who in bad faith retains a security deposit . . . is liable for an amount equal to the sum of $100, three times the portion of the deposit wrongfully withheld, and the tenant's reasonable attorney's fees in a suit to recover the deposit."); *see id.* § 92.109(d) ("A landlord who fails either to return a security deposit or to provide a written description and itemization of deductions on or before

7

With respect to her counterclaim for retaliation, Keaton alleged that Nowlin was prohibited from retaliating against her when Keaton, in good faith, had exercised or attempted to exercise her rights and had made requests for repairs.[7]  According to Keaton, a landlord acts in retaliation when she commits any of the following acts within six months of a tenant exercising her rights or making a repair request:  (1) the landlord files an eviction proceeding against the tenant, (2) the landlord deprives the tenant of use of the premises, (3) the landlord decreases services to the tenant, and (4) the landlord increases the tenant's rent or terminates the tenant's lease agreement, or engages in a bad faith course of conduct that materially interferes with the tenant's rights under the lease agreement.[8]

Keaton alleged that she had exercised her right to the peaceful use and enjoyment of the property by repeatedly requesting that Nowlin reduce the number of intrusions at the property.  In retaliation, Nowlin served Keaton with the June 4, 2014 notice to vacate, attempting to terminate the lease agreement.  Further, when Keaton requested that Nowlin install pin locks on the exterior sliding glass doors, "repair inoperable handle latches" on the exterior sliding glass doors, and provide her address as required by the Texas Property Code, Nowlin served Keaton with the

---

the 30th day after the date the tenant surrenders possession is presumed to have acted in bad faith.").

[7]     *See id.* § 92.331 (retaliation by landlord).

[8]     *See id.* § 92.331(b).

July 2, 2014 notice to vacate. And after Keaton prevailed in Nowlin's forcible-detainer action against her, Nowlin, in retaliation, served Keaton with the September 4, 2014 notice to vacate. Keaton sought $2,600 in damages, "which represent[ed] the statutory penalty of one month's rent plus $500," and attorney's fees.[9]

Keaton further alleged, in regard to her counterclaims for other violations of Texas Property Code, that Nowlin violated Texas Property Code section 92.153(a)(3) by refusing to comply with Keaton's written request for the installation of pin locks on the exterior sliding glass doors at the property;[10] Nowlin violated Texas Property Code section 92.153(a)(5) by refusing to comply with Keaton's written request for the installation of a keyless dead bolt lock on the front door of the property;[11] Nowlin violated Texas Property Code section 92.157(a)(2) by refusing to comply with Keaton's written request for the installation of working handle latches or security bars on the exterior sliding glass doors;[12] and Nowlin

---

[9]    *See id.* § 92.333 ("[I]f a landlord retaliates against a tenant . . . , the tenant may recover from the landlord a civil penalty of one month's rent plus $500, actual damages, court costs, and reasonable attorney's fees . . . .").

[10]    *See id.* § 92.153(a)(3) ("[W]ithout necessity of request by the tenant, a dwelling must be equipped with: . . . a sliding door pin lock on each exterior sliding glass door of the dwelling . . . .").

[11]    *See id.* § 92.153(a)(5) ("[W]ithout necessity of request by the tenant, a dwelling must be equipped with: . . . a keyless bolting device and a door viewer on each exterior door of the dwelling.").

[12]    *See id.* § 92.157(a)(2) ("At a tenant's request made at any time, a landlord . . . shall install: . . . a sliding door handle latch or sliding door security bar if the door is an

9

violated Texas Property Code section 92.158 by "refusing to repair or replace [certain] broken security devices, specifically the inoperable [handle] latches [on the exterior] sliding glass doors."[13]

Related to her counterclaims for violations of Texas Property Code sections 92.153(a)(3) and (a)(5), Keaton sought $13,000 in damages, "which represent[ed] the statutory penalty of one month's rent ($2,100) plus $500, multiplied by five violations," and attorney's fees.[14]  Related to her counterclaim for a violation of Texas Property Code section 92.157(a)(2), Keaton sought $7,800 in damages, "which represent[ed] the statutory penalty of one month's rent ($2,100) plus $500[,] multiplied by four doors," and attorney's fees.[15]  Finally, related to her counterclaim for a violation of Texas Property Code section 92.158, Keaton sought $7,800 in

---

exterior sliding glass door without a sliding door handle latch or sliding door security bar.").

[13]  *See id.* § 92.158 ("During the lease term and any renewal period, a landlord shall repair or replace a security device on request or notification by the tenant that the security device is inoperable or in need of repair or replacement.").

[14]  *See id.* § 92.164(a)(4) ("If a landlord does not comply with [s]ection 92.153 . . . regarding installation . . . of a security device, the tenant may: . . . serve a written request for compliance on the landlord, and[] . . . if the landlord does not comply on or before the third day after the date the notice is received, file suit against the landlord and obtain a judgment for: . . . actual damages[,] . . . a civil penalty of one month's rent plus $500[,] . . . [and] attorney's fees . . . .").

[15]  *See id.* § 92.165(3) ("If a landlord does not comply with a tenant's request regarding rekeying, changing, adding, repairing, or replacing a security device under [s]ection . . . 92.157, . . . the tenant may: . . . file suit against the landlord and obtain a judgment for: . . . actual damages[,] . . . a civil penalty of one month's rent plus $500[,] . . . [and] attorney's fees . . . .").

damages, "which represent[ed] the statutory penalty of one month's rent ($2,100) plus $500[,] multiplied by three devices," and attorney's fees.[16]

At trial, the trial court admitted into evidence a copy of the lease agreement signed by Nowlin and Keaton. The lease term under the agreement began in May 2014 and ended on April 30, 2015. Pursuant to the lease agreement, Keaton was required to pay $2,100 every month directly into Nowlin's bank account (the "deposit account"). Keaton's rent payment was due on the first of the month, but no late fees were to be imposed on Keaton until after the third day of the month. Under the lease agreement, the $2,000 security deposit that Keaton had paid to the property's previous owner was to be transferred to Nowlin at the time she purchased the property. Additionally, the lease agreement provided that Keaton would receive an inventory and condition form on which she was to note any defects or damage to the property that existed at the beginning of the lease term.

In order to move out of the property, the lease agreement required Keaton to provide written move-out notice. Keaton was also liable for a $1,758 reletting fee if she failed to give written move-out notice as required under the lease agreement, moved out without paying rent in full for the entire lease term, moved out at

---

[16]     *See id.* ("If a landlord does not comply with a tenant's request regarding rekeying, changing, adding, repairing, or replacing a security device under [s]ection . . . 92.158 . . . , the tenant may: . . . file suit against the landlord and obtain a judgment for: . . . actual damages[,] . . . a civil penalty of one month's rent plus $500[,] . . . [and] attorney's fees . . . .").

Nowlin's demand because of default, or was judicially evicted. The lease agreement further provided that Nowlin was required to refund Keaton's security deposit, less any lawful deductions, and provide an itemized accounting of any deductions within thirty days of Keaton vacating the property. Nowlin could deduct any unpaid rent from Keaton's security deposit.

In regard to security devices for the property, the lease agreement stated that Nowlin was required by Texas law to provide pin locks on the exterior sliding glass doors, either handle latches or security bars on the exterior sliding glass doors, and "a keyless bolting device (deadbolt) on each exterior door." And Nowlin was required to pay for any missing security devices that were required by statute.

The trial court also admitted into evidence a copy of Keaton's inventory and condition form, which she completed at the beginning of the lease term and which Nowlin signed. The form states that the property contained no "[k]eyless bolting devices," keyless dead bolt locks, or pin locks for the exterior sliding glass doors. Further, the handle latches on the upstairs exterior sliding glass doors did not function. In regard to security bars, the form states that only two of the upstairs exterior sliding glass doors had bars.

Nowlin testified that she and Keaton signed the lease agreement, which had a lease term from May 6, 2014 to April 30, 2015. Under the lease agreement, Keaton

was required to pay $2,100 each month by direct deposit into Nowlin's deposit account.

Keaton made her rent payments in May and June 2014. However, on June 4, 2014, Nowlin served Keaton with a notice to vacate, a copy of which the trial court admitted into evidence. That notice states, in part:

> You have violated your lease contract as noted below:
> Lease Paragraph: 20 Prohibited Conduct.
> See also Paragraph 28 When We May Enter.
>
> Name of resident or occupant or guest in violation: Lori Keaton[.]
>
> Nature of violations: Disturbing or threatening the rights, comfort, health, safety or convenience of others including our agents; disrupting our business operations.
>
> These were substantial breaches of your TAA Lease Contract.
>
> Your residency is terminated effective immediately. You are hereby given notice to vacate the premises on or before midnight, June 5, 2014, which is at least one day from the delivery of this notice in accordance with your lease contract. Failure to move out by then will result in an eviction suit being filed before the Justice of the Peace. Delay or postponement of such action does not waive our rights. You are liable for all rent due under the full term of your contract, damages to the premises, legal fees and any other charges due under the terms of your agreement.

On June 4, 2014, Nowlin also filed a forcible-detainer action against Keaton, alleging that Keaton had breached the lease agreement by unreasonably refusing to allow Nowlin or her agents to enter the property to make repairs or perform maintenance and by failing to pay her rent in a timely manner.

13

According to Nowlin, Keaton did not make any rent payments after June 2014. Thus, in Nowlin's opinion, Keaton had failed to pay $21,000 in rent that was due under the lease agreement. In regard to Keaton's July rent payment, although Keaton told Nowlin that she had tried to make the rent payment for that month, Nowlin explained that Keaton did not make the rent payment on July 1, 2014. And because of this, Nowlin immediately placed "a hold on [any] deposits" into her deposit account, which prevented Keaton from making any rent payments by the method provided for in the lease agreement. In other words, Nowlin "blocked" deposits to the deposit account. On July 2, 2014, Nowlin served Keaton with a second notice to vacate, a copy of which the trial court admitted into evidence. That notice states, in part:

> Re: TAA Lease Contract dated 4/12/14
> between [Keaton] and Linda Nowlin (owner)[.]
>
> Because of non-payment of rent, your residency is terminated effective immediately. You are hereby given notice to vacate the premises on or before midnight, July 3, 2014, which is at least one day from the delivery of this notice in accordance with your lease contract. Failure to move out by then will result in an eviction suit being filed before the Justice of the Peace. Delay or postponement of such action does not waive our rights. You are liable for all rent due under the full term of your contract, damages to the premises, legal fees and any other charges due under the terms of your agreement.

Nowlin noted that at the time she served Keaton with the July 2, 2014 notice to vacate, her forcible-detainer action was still pending.

14

Nowlin further testified, related to her forcible-detainer action, that she had admitted in that suit that she was "aware that under . . . Texas Property Code, [s]ection 92.153," she, as a landlord, was required to install certain items at the property without a request from her tenant. And she conceded in that suit that Keaton had complained about the exterior sliding glass doors at the property because "the locks would not work." Although in Nowlin's opinion, the exterior sliding glass doors were secure, she did admit, in her forcible-detainer action, that her contractors did not think that the doors' locks could be repaired or replaced because "they were so old." Thus, Nowlin's contractors told her that security bars would be required to ensure that the exterior sliding glass doors could not be opened from the outside, and Nowlin testified at that time that she was "ready to buy new bars."

Ultimately, in August 2014, the jury in Nowlin's forcible-detainer action found that Keaton had not unreasonably refused to allow Nowlin or her agents to enter the property and that Keaton had *not* failed to make her rent payments under the lease agreement in a timely manner. And the trial court entered judgment in favor of Keaton in that case, which the Austin Court of Appeals affirmed.[17] A copy of the trial court's charge to the jury in Nowlin's forcible-detainer action, dated August 27, 2014, was admitted into evidence in the instant case, and Nowlin

---

[17] *See Nowlin v. Keaton*, No. 03-14-00608-CV, 2015 WL 3542895 (Tex. App.—Austin June 4, 2015, no pet.) (mem. op.).

15

acknowledged that the jury in her forcible-detainer action determined that Keaton did not violate the lease agreement by making her July rent payment "late." And when asked whether the judgment in the forcible-detainer action stated that "Keaton did not violate the lease [agreement by] paying late or not paying [rent] through August 2014," Nowlin responded, "I believe that's correct." Nowlin further admitted that there was no longer any controversy concerning the amount of rent at issue in her forcible-detainer action, i.e., Keaton's July and August rent payments.

Turning back to the instant case, in regard to the property's front door, Nowlin testified that in a May 19, 2014 letter, a copy of which the trial court admitted into evidence, Keaton requested that a keyless dead bolt lock be installed on the front door. According to Nowlin, her contractors installed a "keyless bolting device" on the door on May 23, 2014. Nowlin explained that in the process of installing the dead bolt lock, her contractors mistakenly "drilled all the way through [the door] thinking that there was supposed to be a key on the outside and a bolting device on the inside." When they realized the mistake, instead of replacing the door, they "took the pin out so that any key put in from the outside would just spin"; it was not connected to any "bolting device." When asked whether the "keyless bolting device" that her contractors installed on the property's front door actually had "a key hole that [someone] could key on the outside of th[e] door," Nowlin responded: "I don't know." On July 28, 2014, Keaton sent Nowlin an email, a copy of which the

16

trial court admitted into evidence, notifying her that the property still required certain "services and repairs," including the installation of a keyless dead bolt lock on the front door.

With respect to the exterior sliding glass doors on the property, Nowlin noted that the only devices securing the exterior sliding glass doors were pieces of wood or PVC pipe that were laid at the bottom of the doors. The trial court admitted into evidence photographs of the pieces of wood and the PVC pipe found at the bottom of the exterior sliding glass doors at the property. Nowlin stated that she never purchased security bars, such as those available at home improvement stores, for the exterior sliding glass doors because she considered the pieces of wood or the PVC pipe to constitute security bars. Nowlin conceded that she was "not sure [whether] placing a PVC pipe in at an angle or a piece of wood" actually secured the exterior sliding glass doors, and she noted that the type of security bars that would "go across the middle of [a] door" would provide additional security for the property. In fact, Nowlin had installed such security bars at other properties that she owned.

Further, Nowlin acknowledged that the exterior sliding glass doors did not have pin locks when she purchased the property and Keaton had told her that the handle latches on the exterior sliding glass doors did not work. Additionally, Nowlin affirmed that the inspector, who inspected the property prior to Nowlin's purchase, also notified her that the handle latches on the upstairs exterior sliding glass doors

17

needed to be adjusted and did not latch. A copy of the inspector's report, which the trial court admitted into evidence, states, in part: "The handle locks for all three sliding glass doors along the [west] side of the house need to be adjusted" because the locks do not latch.

Nowlin also explained that on her inventory and condition form, which Nowlin conceded listed items at the property that were damaged or in need of repair, Keaton noted that the upstairs living room exterior sliding glass door did not lock. And Nowlin confirmed that Keaton referred to the lack of security bars on the exterior sliding glass doors in the June 11, 2014 letter to Nowlin. Moreover, in a July 28, 2014 email to Nowlin, Keaton notified her that the "locks on the [exterior] sliding glass doors" were in need of "services and repairs." At some point while Keaton still lived at the property, Nowlin's contractors readjusted the handle latches on the exterior sliding glass doors to "ma[k]e them easier to lock." In Nowlin's opinion, the handle latches on the exterior sliding glass doors always functioned while Keaton lived at the property.

On September 4, 2014, Nowlin served Keaton with her third notice to vacate. Nowlin testified that this notice to vacate was served after the jury in Nowlin's forcible-detainer action had found in favor of Keaton. The September 4, 2014 notice to vacate, a copy of which the trial court admitted into evidence, states, in part:

Re: TAA Lease Contract dated 4/12/14
between [Keaton] and Linda Nowlin (owner)[.]

18

You are in arrears on your rental payments in the amount of $6,300.00.

Because of your continued violations of the Lease Agreement, including your refusal to provide entry for maintenance upon demand and your non-payment of rent, your residency is terminated effective immediately. You are hereby given notice to vacate the premises before 11:59, p.m., [September] 5, 2014,[18] which is at least one day from the delivery of this notice in accordance with your lease contract. Failure to move out by then will result in an eviction suit being filed against you. Delay or postponement of such action does not waive our rights. You are liable for all rent due under the full term of your contract, damages to the premises, legal fees and any other charges due under the terms of your agreement.

According to Nowlin, the September 4, 2014 notice to vacate, asserted that Keaton had failed to pay $6,300 in rent, which included Keaton's rent for the months of July and August. Nowlin made that assertion even though she knew that the jury, in her forcible-detainer action, did not find that she was entitled to unpaid rent for the months of July and August and even though she knew that she had actually prevented Keaton from paying rent pursuant to the lease agreement.

In accordance with the September 4, 2014 notice to vacate, Keaton moved out of the property on September 5, 2014, which Nowlin opined was before the end of the lease term. Keaton failed to give Nowlin written notice of her move-out, did not pay all of the rent that Nowlin believed she was owed, and did not pay the $1,785

---

[18] The September 4, 2014 notice to vacate mistakenly listed August 5, 2014, rather than September 5, 2014, as the date by which Keaton was required to vacate the property. Nowlin testified that this was a "typo."

19

reletting fee. Nowlin stated that she did not consent to Keaton moving out on or before September 5, 2014, although she wanted Keaton to leave and had tried to evict her.

After Keaton vacated the property, Nowlin discovered that the property had been damaged, and Nowlin spent $13,738 repairing damages she believed that Keaton had caused. We note that Nowlin testified extensively as to the purported damage that Keaton caused to the property, and the trial court admitted into evidence numerous photographs of the property taken by Nowlin. The trial court also admitted into evidence a spreadsheet, dated June 15, 2015, which purported to account for the property's "repairs or damages caused by negligence, carelessness, accident or abuse." Nowlin testified that she did not include amounts for normal "wear and tear" in her accounting, did not charge Keaton for items that were listed on the inventory and condition form, and did not cause any of the damages to the property herself. Nowlin stated that she could not recall ever sending Keaton a copy of the spreadsheet. According to Nowlin, Keaton did not pay or reimburse her for the $13,738 that she had spent repairing the damage to the property.

Nowlin further testified that after Keaton vacated the property, she did not return Keaton's $2,000 security deposit because Keaton "owed more in rent than the amount of the security deposit," including rent for the month of September 2014. On October 4, 2014, Nowlin sent Keaton an email, a copy of which the trial court

20

admitted into evidence, with a subject line stating: "Security Deposit Accounting." That email states, in part:

> I am sending this to the last known email address I have for you because you did not designate a physical forwarding address after you moved out, as required by the lease agreement. The lease requires that I send you an accounting of your security deposit within thirty days of your leaving the property. That accounting is as follows:
>
> Because you have unpaid rent that exceeds your $2,000.00 security deposit, you are not entitled to a refund of any portion thereof.

Nowlin testified that her October 4, 2014 email did not "provide an itemized list of all rent and damages due."

In response to Nowlin's email, Keaton's attorney sent an email, a copy of which the trial court admitted into evidence, requesting that Keaton's $2,000 security deposit be returned in full, providing Keaton's forwarding address, and stating that the trial court in Nowlin's forcible-detainer action had "stated unequivocally in open court that . . . Keaton d[id] not owe rent to . . . Nowlin." Nowlin acknowledged that under the Texas Property Code she had an obligation to refund Keaton's security deposit or "provide an accounting within 30 days" of Keaton's moving out of the property.

Keaton testified that she moved into the property in 2011 after signing a lease agreement with the property's previous owner. When Keaton moved into the property, the locks on the exterior sliding glass doors did not function.

21

After Nowlin purchased the property, in May 2014, she, or her contractors, began coming to the property approximately every other day. Keaton characterized Nowlin's intrusions as excessive and stated that Nowlin demanded "24/7" access to the property. For instance, on May 6, 2014, the first day that the lease agreement was in effect, Nowlin sent Keaton multiple "urgent" text messages demanding entry to the property. And when Nowlin arrived at the property, she started opening drawers, "taking things out," and "putting things in" without Keaton's permission. On May 19, 2014, Keaton sent Nowlin a letter, a copy of which the trial court admitted into evidence. That letter states, in part:

> It is my understanding that you have four projects in the works right now: the kitchen (which has already displaced me for a week to a shady extended stay), the front door, the porch light, and the garage door. It is my perception that your plans extend past those projects.

> While I am quite aware of our lease regarding repairs and entry into my home while I am your tenant, I am feeling the effect of having my privacy, peace, and quiet disrupted. I feel that the frequency of the visits and intrusions are becoming excessive and I fear that if I don't speak up, I will be allowing the precedence of unlimited intrusions into my home and my life.

> My research into the regulations and case law have educated me about my rights to peace and quiet and my rights to privacy as your tenant. . . . What I have found is that repairs that do not compromise the integrity of the property nor compromise my safety or security, are not necessary to attend while I hold present possessory interest. (Tex. Prop. Code section 92.052a)[.] In fact, I believe that they intrude on my right to privacy and my right to peace and quiet. (HYM Restaurants, Inc. v Goldman Sachs &Co., 797 S.W.2d 326, 1990)[.]

It is my request that only repairs that may compromise the integrity of the property or compromise my family's safety and/or security, be addressed and remedied while I am leasing from you.

I also request that you install a keyless deadbolt on the front door and the downstairs entry door to ensure my privacy and security when I am home. (Tex. Prop. Code section 92.153)[.]

(Emphasis omitted.)

After Keaton's May 19, 2014 letter, Nowlin's visits to the property continued, and Nowlin became more abrasive in her demands to enter the property. On one occasion, Keaton discovered that Nowlin's contractors had used her personal tools to mix concrete and that someone had entered the property while she was not there and without providing proper notice. Keaton realized that either Nowlin or her agents had entered the property on that particular day because "lights had been left on in the loft, furniture had been moved away from the wall as though [Nowlin] or her agents were inspecting outlets, . . . [a]nd an entire light fixture in the loft had been removed." On another occasion, Nowlin came to the property in the morning while Keaton was still asleep. Because Nowlin failed to bring her key with her, she knocked on the front door. When Keaton did not answer, Nowlin repeatedly called her on her telephone until Keaton answered. After Nowlin requested that Keaton let her into the property, Keaton informed her that she was not clothed, but she would answer the door anyways. Keaton opined that this incident led to Nowlin serving her with the June 4, 2014 notice to vacate.

23

On June 11, 2014, Keaton sent Nowlin another letter "point[ing] out a lot of the violations that [Nowlin] had committed according to the [Texas] Property Code." The letter, a copy of which the trial court admitted into evidence, states, in part:

I received your Notice to Vacate for Breach of Lease dated June 4, 2014 and was served with an Eviction Citation on June 10, 2014. . . .

***What You Want Has Changed[.]***
I want to understand what you want so that I may try to accommodate you as best as I can without unreasonably compromising my standard of living. Prior to the closing, I believe we both wanted the same thing: in effect, for me to pay your mortgage, taxes, and insurance for the next year on the [property].

However, since the closing date May 6th but prior to June 1st, and as evidenced by your correspondence (see attached) my perception is that your desires changed to:
1) 24 hour access to the house to make inspections, repairs, and upgrades, no matter the effect it has on the lives of me and my family; and
2) $2100/month in rent for the next eleven months.

Since June 1st, based on your correspondence, your lack of compliance with our lease and state statute, and the aforementioned Notice to Vacate and Eviction suit, I believe you now want:
1) to not fulfill your lease obligations and instead, have me move out, thereby displacing me and my family;
2) to keep my security deposit of $2000; and
3) to charge me a reletting fee of $1785.

. . . .

***I Am in Compliance with All Lease Provisions and State Statutes and Demand an Explanation[.]***
I am not in violation of Paragraph 20 – Prohibited Conducted. I have not disturbed or threatened the rights of you or any of your agents, and I have not disrupted your business operation. Although I asked that you confine your entry to the [property] to the hours of 9 a.m. – 5 p.m.,

24

preferably weekdays, and only for repairs that threaten my family's safety or the integrity of the [property], I have never refused you entry into the [property] when I'm present. I provided you all the keys and access codes when you asked for them. . . .

***You, as Landlord, Are in Violation of Our Lease and State Statutes[.]***

1) *You are in violation of Texas Property Code Sec. 92.201.*
You have omitted your physical address from all correspondence and contracts between us.

2) *You are in violation of Lease Paragraph 28 – When We (Landlord) May Enter.*
You did not leave a written notice why you or your contractors were in the loft while I was not home. This event is documented in a May 24th email (see attached) from me to you.

3) *You are in violation of Lease Paragraph 9 – Security Devices; Lease Paragraph 25 – Condition of the Premises and Alterations; Lease Paragraph 31 – Responsibilities of Owner; Texas Property Code Sec. 92.153(a)(3) and (a)(4); and Texas Property Code Sec. 92.157.*

You have refused to install a sliding door pin lock on each exterior sliding glass door of the dwelling and a sliding door handle latch or a sliding door security bar on each exterior sliding glass door of the dwelling. You were made aware of the lack of this statutorily-mandated requirement by: a) the inspection report; b) the lease[;] c) the move-in check list; and d) this correspondence.

In addition, your removal of wood from around the frame of the front door has compromised its integrity and stolen from me and my family the peace of mind and security for which a front door is intended. Your stated intention (see attached email) was to repair the front door by replacing the frame to ensure its security; instead, you made the door insecure and have yet to schedule to repair it. According to Lease Paragraph 31, I have the right to terminate our lease but have

25

elected not to do so. As the attached emails show, I have satisfied the criteria required to allow me to terminate our lease as evidenced by: a) your agent's unfinished work on the front door leaving it unsecure and unsafe; b) the inspection report; c) previous emails regarding legally mandated repair request; and d) this letter.

4) *You have trespassed and you have authorized others to do so* by giving your contractors consent to store their belongings in the garage of which I have present possessory interest.

5) *You are in violation of Texas Property Code Sec. 92.331.* You are retaliating against me. I've exercised in good faith my rights granted to me by our lease, municipal ordinance, or federal or state statute. I've also given you notices regarding repairs. You are breaking the law by filing an eviction proceeding, depriving me the use of the premises, decreasing services to me, attempting to terminate my lease, and engaging in bad faith, in a course of conduct, that materially interferes with my rights under our lease.

In regard to the property's front door, Keaton explained that when she moved into the property, in 2011, there was a wooden door that was weathered and rotting. Eventually, Keaton, before Nowlin purchased the property, replaced that wooden door with a metal door that she had purchased herself. At the time that Keaton switched the front doors, she also intended to replace the front door's frame, but she did not complete that work before Nowlin's purchase of the property. After the purchase, Nowlin told Keaton that she did not want her to do any repairs to the property and Nowlin's contractors would finish replacing the front door's frame. However, when the contractors completed their work on the front door, they left it unsecured. Specifically, the front door could not close independently and if the door

26

was not "dead[-]bolted," then it could simply be kicked open. The contractors, while completing their work on the front door's frame, also caused the window next to the front door to become unsecured, allowing an individual to "come up and kick it open with ease."

Keaton further testified, related to the front door, that she requested the installation of a keyless dead bolt lock on the door. However, according to Keaton, the lock that Nowlin's contractors actually installed on the front door had a keyhole, which Nowlin "wanted [Keaton] to consider [to be] keyless on the door." In other words, instead of a keyless dead bolt lock, a "keyed" dead bolt lock was installed on the front door. Although Keaton did not have the key for the lock, she explained that the lock had been manufactured with a key.

With respect to the exterior sliding glass doors on the property, Keaton testified that there were four—three upstairs and one downstairs. All of the sliding glass doors lacked pin locks and appropriate security bars. Also, the handle latches on the upstairs exterior sliding glass doors did not function. Keaton noted on her inventory and condition form that the exterior sliding glass doors did not lock and that the upstairs exterior sliding glass doors did not latch. Keaton explained that at the time that she filled out her inventory and condition form, she did not know what constituted a security bar. Nowlin never repaired the handle latches on the exterior sliding glass doors and did not install pin locks or security bars.

27

In regard to the payment of rent, Keaton testified the lease agreement required her to pay $2,100 per month for twelve months. Keaton's rent payment was due on the first of the month and considered late on the fourth of the month. In May 2014, Keaton made her rent payment to the property's previous owner, who then transferred a prorated amount to Nowlin. In June 2014, she made a $2,100 rent payment to Nowlin. In July 2014, when Keaton tried to make her rent payment, Nowlin's bank refused to accept Keaton's direct deposit into Nowlin's deposit account. Thereafter, Keaton was never able to "successfully convey[] to [Nowlin] any money for rent." Further, after Nowlin prevented Keaton from directly depositing her rent payments into the deposit account, Nowlin specifically told Keaton that "she would never accept [her] rent," including Keaton's September 2014 rent payment. When asked at trial whether "[b]efore [she] moved out, did [she] pay all of the rent that was due under the [lease agreement]," Keaton responded, "[Y]es." Keaton also opined that she was not required to pay $21,000 in rent for the remaining ten months of the lease term because the lease agreement was no longer in effect at the time that she vacated the property and it had been terminated by Nowlin.

Keaton moved out of the property on September 5, 2014, and in doing so, she spent between $500 and $800 on a "storage pod." Keaton stated that she gave Nowlin verbal notice that she was moving out, and the lease agreement provided exceptions to the requirement that her move-out notice be in writing.

28

When Keaton vacated the property, she left it "spotless" and in a better condition than when she had moved in. She mowed the lawn, repaired holes and texturized the walls in places, removed all trash, shampooed and vacuumed the carpets, and extensively cleaned the property. According to Keaton, she did not "leave [the property] trashed." During Keaton's testimony, the trial court admitted into evidence four videotaped recordings showing the property after Keaton had moved out.

Finally, Keaton testified that Nowlin never returned any portion of her $2,000 security deposit. According to Keaton, Nowlin told her that she was deducting Keaton's unpaid rent from the security deposit, and Keaton's unpaid rent exceeded $2,000.

Russell Maughan, a handyman, testified that he performed work at the property for Nowlin. In regard to the property's front door, Maughan testified that he installed a keyless dead bolt lock on the door. And although the keyless dead bolt lock that he installed had a keyhole, he "disconnect[ed] th[e] connecting key pin from the outside key part to the inside latch part which basically render[ed] [the lock] a keyless dead bolt [lock]." Thus, if someone was to put a key in or "try to pick the lock" on the outside, the key would "spin in the cylinder and not engage the dead bolt," and the lock could not be operated from the outside. In Maughan's opinion,

29

he installed, on the property's front door, a lock that functioned as a keyless dead bolt lock.

With respect to the exterior sliding glass doors at the property, Maughan explained that while Keaton was living at the property, he fixed the handle latches on the exterior sliding glass doors so that they would lock properly. More specifically, in regard to the exterior sliding glass doors' handle latches, Maughan stated:

> Typically there's a bar in the track, then a little lever comes up and latches either from the top or the bottom, depending upon the door and how it's installed. And almost all of them were misaligned. The little -- what it connects to, what the latch connects to, was either too high or too low. Not all of them but a couple of them if I remember correctly. They weren't adjusted properly. So I adjusted the catch mechanism that's in the door frame to where when they did it, they would lock. And when I was done, they all locked properly.

Further, Maughan testified that he did not install pin locks on any of the exterior sliding glass doors, and he was not "positive" whether "one or two of [the doors] already had pin locks."

The jury found in favor of Keaton on Nowlin's breach-of-lease-agreement claim. The jury also found in favor of Keaton on her counterclaims for failure to refund security deposit,[19] retaliation,[20] and other violations of the Texas Property

---

[19]    *See* TEX. PROP. CODE ANN. §§ 92.103, 92.104.

[20]    *See id.* § 92.331.

Code.[21] Specifically, the jury found that Nowlin, in bad faith, wrongfully failed to refund Keaton's $2,000 security deposit; Nowlin retaliated against Keaton; Nowlin, within a reasonable time after having received a written request, failed to install a keyless dead bolt lock on the property's front door, install pin locks on the exterior sliding glass doors without pin locks, install security bars on the exterior sliding glass doors without security bars, and repair or replace the handle latches on the exterior sliding glass doors; and $500 would reasonably compensate Keaton for Nowlin's failure to install, repair, or replace the aforementioned security devices.

Nowlin filed a motion for a judgment notwithstanding the verdict, asserting that no evidence supported the jury's failure to find that Keaton breached the lease agreement and no evidence supported the jury's affirmative findings on Keaton's counterclaims for failure to refund security deposit, retaliation, and other violations of the Texas Property Code. Keaton moved for entry of judgment based on the jury's findings and for an award of attorney's fees.[22]

The trial court entered a judgment that Nowlin take nothing on her claim against Keaton for breach of lease agreement. Further, the trial court entered a judgment in favor of Keaton on her counterclaims, and in doing so, awarded her

---

[21] *See id.* §§ 92.153(a)(3), (a)(5), 92.157(a)(2), 92.158.

[22] By agreement, issue of attorney's fees was tried to the trial court.

31

$500 in actual damages, $19,100 in statutory damages, and $28,775 in attorney's fees.

Nowlin subsequently filed a motion for new trial, which the trial court denied.

**Breach of Lease Agreement**

In her first issue, Nowlin argues that the trial court erred in entering judgment in favor of Keaton on Nowlin's claim for breach of lease agreement because the evidence conclusively establishes that Keaton failed to pay rent, failed to pay the $1,785 reletting fee, and moved out before the end of the lease term without giving written notice and paying rent in full for the entire lease term.[23]

When a party attacks the legal sufficiency of an adverse finding on an issue for which she bears the burden of proof, the party must demonstrate that the evidence establishes, as a matter of law, all vital facts in support of the issue. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In conducting a legal sufficiency review, we review the evidence presented below in the light most favorable to the jury's verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Del Lago*

---

[23] To the extent that Nowlin asserts that the trial court erred in denying her motion for summary judgment on her breach-of-lease-agreement claim, we note that after a trial on the merits, the denial of a motion for summary judgment may not be reviewed on appeal. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966); *Tricon Tool & Supply, Inc. v. Thumann*, 226 S.W.3d 494, 509 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

*Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A legal-sufficiency challenge may only be sustained if the contrary position is conclusively established by the evidence. *Dow Chem.*, 46 S.W.3d at 241. Evidence is conclusive only if reasonable people could not differ in their conclusions. *See City of Keller*, 168 S.W.3d at 816.

The jury, as the fact finder, is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. It may choose to believe one witness over another. *Id.* A reviewing court must assume that the jury resolved all conflicts in the evidence in accordance with its decision if a reasonable fact finder could have done so. *See id.* at 820. A reviewing court may not "impose [its] own opinions to the contrary" or "substitute its judgment for that of the [jury]." *Id.* at 819, 822. The jury "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses," so long as the decision to disregard is reasonable. *Id.* at 820.

In Question No. 1 of its charge to the jury, the trial court asked, related to Nowlin's breach-of-lease-agreement claim:

Did LORI KEATON fail to comply with the [lease agreement] by:

1.       Not paying rent and fees, and/or

2.       Moving out before the end of the lease term without giving written notice and paying rent in full for the entire lease term?

Answer "Yes" or "No."[24]

The jury answered: "No."

In regard to the payment of rent, the lease agreement, provided that Keaton was to pay $2,100 each month directly into Nowlin's deposit account for the term of the lease. Keaton testified that her rent was due on the first of each month and was considered late on the fourth of each month. It is undisputed that Keaton made her rent payments in both May and June 2014.

When Keaton tried to make her July 2014 rent payment by direct deposit, as required by the lease agreement, Nowlin's bank refused to accept the payment into Nowlin's deposit account. According to Nowlin, she had placed "a hold on [any] deposits" and "blocked" deposits into her deposit account immediately after Keaton did not make her rent payment on July 1, 2014. Nowlin considered Keaton's July rent payment to be late because it was not paid on the first day of the month.

Further, Keaton testified that, after Nowlin prevented Keaton from directly depositing her rent payments into the deposit account, Nowlin specifically told her that "she would never accept" rent from Keaton, including Keaton's September 2014

---

[24]     Nowlin raised no objection in the trial court to Question No. 1.

payment. Keaton opined that she was not required to pay $2,100 each month for the remaining ten months of the lease term, which Nowlin had claimed she was owed, because the lease agreement was no longer in effect and had been terminated by Nowlin. When asked at trial whether "[b]efore [she] moved out, did [she] pay all of the rent that was due under the [lease agreement]," Keaton responded, "[Y]es."

Moreover, in regard to Nowlin's forcible-detainer action, previously filed on June 4, 2014, Nowlin testified that the jury in that case found that Keaton had *not* failed to pay her rent in a timely matter, and the trial court entered judgment in favor of Keaton, which the Austin Court of Appeals affirmed.[25] Nowlin acknowledged at trial that the jury in her forcible-detainer action determined that Keaton did not violate the lease agreement for making her July rent payment "late." And when asked whether the judgment in the forcible-detainer action stated that "Keaton did not violate the lease [agreement by] paying late or not paying [rent] *through* August 2014," Nowlin responded, "I believe that's correct." (Emphasis added.) Nowlin further admitted that there was no longer any controversy concerning the amount of rent at issue in her forcible-detainer action, i.e. Keaton's July and August rent payments. And an email from Keaton's attorney to Nowlin stated that the trial court in Nowlin's forcible-detainer action had "stated unequivocally in open court that . . . Keaton d[id] not owe rent to . . . Nowlin."

---

[25] *See Nowlin*, 2015 WL 3542895, at *1–8.

On appeal, Nowlin argues that the jury was required to answer "yes" to Question No. 1 if Keaton did *any* one of the following: (1) failed to pay rent owed to Nowlin under the lease agreement; (2) failed to pay any fees owed to Nowlin under the lease agreement; (3) moved out of the property before the end of the lease term without giving written notice; *or* (4) moved out of the property before the end of the lease term without paying rent in full for the entire lease term. We disagree.

Notably, the trial court, in regard to Nowlin's breach-of-lease agreement claim, asked the jury whether Keaton failed to comply with the lease agreement by: (1) failing to pay rent *and* fees owed under the lease agreement; and/*or* (2) moving out of the property before the end of the lease term without giving written notice *and* without paying rent in full for the entire lease term. *See In re Brookeshire Grocery Co.*, 250 S.W.3d 66, 69–70 (Tex. 2008) ("'And' is conjunctive . . . . '[A]nd and or are not interchangeable . . . .'" (quoting *Bayou Pipeline Corp. v. R.R. Comm'n of Tex.*, 568 S.W.2d 122, 125 (Tex. 1978)); *In re L.K.*, No. 02-18-00049-CV, 2018 WL 5832131, at *3 n.4 (Tex. App.—Fort Worth Nov. 8, 2018, no pet.) (mem. op.); *see also Bd. of Ins. Comm'rs v. Guardian Life Ins. Co. of Tex.*, 180 S.W.2d 906, 908 (Tex. 1944) ("Ordinarily the words 'and' and 'or,' are in no sense interchangeable terms[;] . . . the former being strictly of a conjunctive, the latter, of a disjunctive, nature."); *Bridwell v. State*, Nos. 05-07-00258-CR, 05-07-00259-CR 2008 WL 467271, at *7 (Tex. App.—Dallas Feb. 23, 2008, no pet.) (mem. op., not designated

for publication) (jury instructions which included "and/or" "presented th[e] three, different material facts in the disjunctive" (internal quotations omitted)); *Sedillo v. Valtierra*, 115 S.W.3d 52, 53 (Tex. App.—San Antonio 2003, pet. denied) (term "and/or" can be used to imply that "*either* or both of the things mentioned may be affected or involved" (emphasis added) (quoting *And/or*, RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (2d ed. 1999))); *Dubose v. Reed*, No. 14-94-00546-CV, 1995 WL 417049, at *3 (Tex. App.—Houston [14th Dist.] July 13, 1995, no writ) (not designated for publication) ("Question three was phrased in both the conjunctive and disjunctive; that is, question three asked whether Dubose 'and/or' Virginia City owned the horse, 'Jim.' In other words, the jury could find that Dubose and Virginia City jointly owned the horse in question or that either Dubose, individually, or Virginia City owned the horse.").

Here, the jury heard evidence that Keaton paid rent and vacated the property only after "pay[ing] all of the rent that was due under the [lease agreement]." And we note that the jury, as the fact finder, was the sole judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. Further, the jury could choose to believe one witness over another and could resolve inconsistencies in the testimony of any witness. *Id.* at 819–20; *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

37

Thus, we conclude that Nowlin has not established as a matter of law that Keaton failed to comply with the lease agreement by "[n]ot paying rent *and* fees" or by "[m]oving out before the end of the lease term without giving written notice *and* paying rent in full for the entire lease term." (Emphasis added.) Accordingly, we hold that the evidence is legally sufficient to support the jury's failure to find that Keaton did not comply with the lease agreement and the trial court did not err in entering judgment in favor of Keaton on Nowlin's claim for breach of lease agreement.

We overrule Nowlin's first issue.

Due to our disposition above, we need not address Nowlin's arguments that she "is entitled to [a] judgment as a matter of law that [Keaton] was not excused" from failing to comply with the lease agreement and that Keaton "is liable to [Nowlin] in [the] total amount of $20,785" on Nowlin's breach-of-lease-agreement claim. *See* TEX. R. APP. P. 47.1.

**Failure to Refund Security Deposit**

In her second issue, Nowlin argues that the trial court erred in entering judgment in favor of Keaton on Keaton's counterclaim for failure to refund security deposit because the evidence shows that the lease agreement "provides that any rent owed and delinquent at the time of move-out [could] be deducted from [Keaton]'s security deposit," Nowlin "made one deduction [from] the security deposit, in its full

38

amount of $2,000, because [Keaton] owed rent at least in the amount of $2,100 for the month of September," and Nowlin sent Keaton "an [a]ccounting of the deposit that itemized and listed the sole deduction [that] she made thereto."[26] Nowlin further asserts that Keaton was not entitled to the presumption of bad faith and there was no evidence of "dishonesty or disregard . . . adduced at trial."

When a party attacks the legal sufficiency of an adverse finding on an issue for which she did not have the burden of proof, she must demonstrate that there is no evidence to support the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011); *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex. App.—Dallas 2012, no pet.). We will sustain a legal sufficiency or "no-evidence" challenge if the record shows any one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. In conducting a legal-sufficiency review, we consider the

---

[26] To the extent that Nowlin asserts that the trial court erred in denying her motion for summary judgment on Keaton's failure-to-refund-security-deposit counterclaim, we note that after a trial on the merits, the denial of a motion for summary judgment may not be reviewed on appeal. *Ackermann*, 403 S.W.2d at 365; *Tricon Tool & Supply*, 226 S.W.3d at 509.

39

evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *Id.* at 822. The term "inference" means,

> [i]n the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved. . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (internal quotations omitted). "For a jury to infer a fact, it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within th[e] zone of reasonable disagreement." *Id.*

40

Again, the jury, as the fact finder, is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. It may choose to believe one witness over another. *Id.* A reviewing court must assume that the jury resolved all conflicts in the evidence in accordance with its decision if a reasonable fact finder could have done so. *See id.* at 820. A reviewing court may not "impose [its] own opinions to the contrary" or "substitute its judgment for that of the [jury]." *Id.* at 819, 822. The jury "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses," so long as the decision to disregard is reasonable. *Id.* at 820.

Chapter 92, subchapter C of the Texas Property Code governs security deposits in residential leases. *See* TEX. PROP. CODE ANN. §§ 92.101–.110. A security deposit is defined as "any advance of money, other than a rental application deposit or an advance payment of rent, that is intended primarily to secure performance under a lease of a dwelling." *Id.* § 92.102.

A landlord is required to refund a security deposit to the tenant on or before the thirtieth day after the date the tenant surrenders the premises. *Id.* § 92.103(a). However, before returning a security deposit, the landlord may deduct from the security deposit damages and charges for which the tenant is legally liable under the lease agreement or as a result of breaching the lease agreement. *Id.* § 92.104(a). The

41

landlord may not retain any portion of the security deposit to cover normal wear and tear. *Id.* § 92.104(b).

If the landlord retains all or part of the security deposit, the landlord shall give the tenant, within thirty days of the tenant's surrender of the premises: (1) the balance of the security deposit, if any; (2) a written description of the damages; and (3) an itemized list of all deductions. *Id.* § 92.104(c). However, the landlord is not obligated to return a tenant's security deposit or give the tenant a written description of the damages and an itemized list of the deductions until the tenant gives the landlord a written statement of the tenant's forwarding address for the purpose of returning the security deposit. *Id.* § 92.107(a).

Chapter 92, subchapter C of the Texas Property Code establishes two causes of action that permit a tenant to seek recovery of her security deposit from her landlord. *See id.* § 92.109 (liability of landlord). Each of these causes of action provides the tenant with a different remedy. Relevant to this case, the first cause of action involves a landlord's bad faith retention of the security deposit. *See id.* § 92.109(a). To prevail under that cause of action, the tenant must prove that the landlord: (1) acted in bad faith and (2) retained the security deposit in violation of chapter 92, subchapter C of the Texas Property Code. *Id.* When a landlord is found liable under section 92.109(a), the tenant may recover from the landlord: (1) an amount equal to the sum of $100; (2) three times the portion of the security deposit

42

wrongfully withheld; and (3) the tenant's reasonable attorney's fees in a suit to recover the security deposit. *Id.*

When a tenant sues a landlord to recover her security deposit under the above cause of action, the tenant must prove the landlord acted in bad faith. *See id.* § 92.109(a), (b). Bad faith is presumed when a landlord fails to: (1) return the security deposit or (2) provide a written description of the damages and an itemized list of all deductions within thirty days after the tenant surrenders the premises. *Id.* § 92.109(d). A landlord acts in bad faith when she retains the security deposit in dishonest disregard of the tenant's rights. *See Pulley v. Milberger*, 198 S.W.3d 418, 428 (Tex. App.—Dallas 2006, pet. denied). Bad faith implies an intention to deprive the tenant of a lawfully due refund. *See Pulley*, 198 S.W.3d at 428; *Leskinen v. Burford*, 892 S.W.2d 135, 136 (Tex. App.—Houston [14th Dist.] 1994, no writ). Absent rebutting evidence, the presumption that the landlord acted in bad faith compels a finding of bad faith. *See Pulley*, 198 S.W.3d at 428. Even when a landlord defeats the presumption of bad faith as to the failure to return a security deposit, the landlord still must prove the retention of any portion of the security deposit was reasonable. *See* TEX. PROP. CODE ANN. § 92.109(c); *Pulley*, 198 S.W.3d at 429.

Here, in Question No. 4 of its charge, the trial court asked the jury, related to Keaton's failure-to-return-security-deposit counterclaim:

> Did LINDA S. NOWLIN wrongfully fail to refund any portion of LORI KEATON's security deposit?

43

A security deposit is any advance of money, other than a rental application deposit or an advance payment of rent, that is intended primarily to secure performance under a lease of a dwelling that has been entered into by a landlord and a tenant. A landlord shall refund the security deposit to the tenant not later than the 30th day after the date the tenant surrenders the premises.

Before returning the security deposit, the landlord may deduct from the deposit damages and charges for which the tenant is legally liable under the lease or as a result of breaching the lease, but may not retain any portion of a security deposit to cover normal wear and tear. "Normal wear and tear" means deterioration that results from the intended use of a dwelling, including breakage or malfunction due to age or deteriorated condition, but does not include deterioration that results from negligence, carelessness, accident, or abuse of the premises by a member of the tenant's household, or by a guest or invitee of the tenant.

If the landlord retains all or part of a security deposit under this section, the landlord shall give to the tenant the balance of the security deposit, if any, together with a written description and itemized list of all deductions.

The landlord is not obligated to return a tenant's security deposit or give the tenant a written description of damages and charges until the tenant gives the landlord a written statement of the tenant's forwarding address for the purpose of refunding the security deposit. The tenant does not forfeit the right to a refund of the security deposit or the right to receive a description of damages and charges merely for failing to give a forwarding address to the landlord.

Answer "Yes" or "No."[27]

The jury answered: "Yes."

---

[27] Nowlin raised no objection in the trial court to Question No. 4.

On October 4, 2014, Nowlin sent Keaton an email with a subject line stating: "Security Deposit Accounting." That email states, in part:

> I am sending this to the last known email address I have for you because you did not designate a physical forwarding address after you moved out, as required by the lease agreement. The lease requires that I send you an accounting of your security deposit within thirty days of your leaving the property. That accounting is as follows:
>
> Because you have unpaid rent that exceeds your $2,000.00 security deposit, you are not entitled to a refund of any portion thereof.

Nowlin admitted that her October 4, 2014 email did not "provide an itemized list of all rent and damages due."

Nowlin argues that the evidence is legally insufficient to support the jury's finding that she wrongfully failed to refund any portion of Keaton's security deposit because the lease agreement "provides that any rent owed and delinquent at the time of move-out [could] be deducted from [Keaton]'s security deposit" and Nowlin "made one deduction [from] the security deposit, in its full amount of $2,000, because [Keaton] owed rent at least in the amount of $2,100 for the month of September at the time she abandoned the [p]roperty."

However, as discussed related to Nowlin's first issue, the jury heard evidence that Keaton paid rent and vacated the property only after "pay[ing] all of the rent that was due under the [lease agreement]." In other words, the record contains evidence that Keaton did not owe rent, including her September 2014 rent payment, at the time she vacated the property. And the jury, as the fact finder, was the sole

45

judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. It could choose to believe one witness over another and could resolve inconsistencies in the testimony of any witness. *Id.*; *McGalliard*, 722 S.W.2d at 697.

Here, we cannot say that the jury's finding that Nowlin wrongfully failed to refund any portion of Keaton's security deposit is not supported by more than a scintilla of evidence.

In Question No. 6 of its charge, the trial court asked the jury, related to Keaton's failure-to-return-security-deposit counterclaim:

> Did LINDA S. NOWLIN fail to refund any portion of LORI KEATON's security deposit in bad faith?
>
> You are instructed that a landlord acts in "bad faith" when he or she retains a security deposit in dishonest disregard of the tenant's rights or with the intent to deprive the tenant of a lawfully due refund.
>
> A landlord who fails to return a security deposit or give a written description and itemized list of all deductions on or before the 30th day after the tenant surrenders possession and provides a forwarding address is presumed to have acted in bad faith. To defeat this presumption, a landlord must prove [her] "good faith," which means honesty in fact in the conduct or transaction concerned.
>
> Answer "Yes" or "No."[28]

The jury answered: "Yes."

---

[28]   Nowlin raised no objection in the trial court to Question No. 6.

In a single conclusory paragraph in her brief, Nowlin argues that the evidence is legally insufficient to support the jury's finding that she failed to refund any portion of Keaton's security deposit in bad faith because the presumption of bad faith does not apply. And absent the presumption, Keaton was required to prove that Nowlin "retained some portion of the security deposit in dishonest disregard of [Keaton]'s rights." Here, according to Nowlin, no evidence of such dishonesty or disregard was adduced at trial.

Texas Rule of Appellate Procedure 38.1(i) requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). "This is not done by merely uttering brief conclusory statements, unsupported by legal citations." *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *see also Barham v. Turner Constr. Co. of Tex.*, 803 S.W.2d 731, 740 (Tex. App.—Dallas 1990, writ denied) (appellant bears burden of discussing assertions of error). A failure to provide substantive analysis of an issue or cite appropriate authority waives a complaint on appeal. *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 255 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Nevertheless, in regard to the merits of Nowlin's argument, we note that, even without taking into account the presumption of bad faith, the jury, in the instant case, heard evidence that Nowlin refused to refund any portion of Keaton's security deposit even though Nowlin had: (1) placed "a hold" on her deposit accounts preventing Keaton from paying her rent by the method prescribed by the lease agreement, (2) specifically told Keaton that "she would never accept [her] rent," including Keaton's September 2014 rent payment, and (3) lost her forcible-detainer action, wherein the jury found that Keaton had not failed to timely pay her rent and she had not "violate[d] the lease [agreement by] paying late or not paying [rent] *through* August 2014." (Emphasis added.) And the jury heard evidence that Keaton had actually paid rent and vacated the property only after "pay[ing] all of the rent that was due under the [lease agreement]."

The trial court's charge to the jury in Question No. 6 defined "bad faith" as follows: "[A] landlord acts in 'bad faith' when he or she retains a security deposit in dishonest disregard of the tenant's rights or with the intent to deprive the tenant of a lawfully due refund." We cannot say that the jury's finding that Nowlin failed to refund any portion of Keaton's security deposit in bad faith is not supported by more than a scintilla of evidence.

Accordingly, we hold that the evidence is legally sufficient to support the jury's findings that Nowlin "wrongfully fail[ed] to refund any portion

48

of . . . Keaton's security deposit" and "fail[ed] to refund any portion of . . . Keaton's security deposit in bad faith" and the trial court did not err in entering judgment in favor of Keaton on Keaton's counterclaim for failure to refund security deposit. (Emphasis omitted.)

We overrule Nowlin's second issue.

Due to our disposition above, we need not address Nowlin's argument that that the jury's finding in response to Question No. 5, i.e., that Nowlin wrongfully failed to refund $2,000 of Keaton's security deposit, should be disregarded because Nowlin, as a matter of law, did not wrongfully fail to refund any portion of Keaton's security deposit. *See* TEX. R. APP. P. 47.1; *see also* TEX. R. APP. P. 38.1(i); *Tesoro Petroleum Corp.*, 106 S.W.3d at 128.

## Retaliation

In her third issue, Nowlin argues that the trial court erred in entering judgment in favor of Keaton on Keaton's counterclaim for retaliation because Keaton was required to prove "retaliatory intent . . . by offering evidence of it other than her own bare, self-serving speculation about [Nowlin]'s motives," Nowlin provided reasons for serving her three notices to vacate on Keaton, Keaton's "defending herself

49

against eviction c[ould] only have caused the second or third notice to vacate," and "[t]ransmitting a notice to vacate is not a prohibited action."[29]

As previously noted, when a party attacks the legal sufficiency of an adverse finding on an issue for which she did not have the burden of proof, she must demonstrate that there is no evidence to support the adverse finding. *See Exxon Corp.*, 348 S.W.3d at 215; *Examination Mgmt. Servs.*, 367 S.W.3d at 839. If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp.*, 960 S.W.2d at 48.

Chapter 92 of the Texas Property Code prohibits retaliation by a landlord against a tenant and provides a tenant with a right to recover against a landlord who retaliates. *See* TEX. PROP. CODE ANN. § 92.331; *see also Dall. Hous. Auth. v. Nelson*, 05-13-00818-CV, 2015 WL 1261953, at *3 (Tex. App.—Dallas Mar. 19, 2015, pet. denied) (mem. op.); *San Antonio Hous. Auth. Found., Inc. v. Smith*, No. 04-10-00759-CV, 2011 WL 3627699, at *2 (Tex. App.—San Antonio Aug. 17, 2011, no pet.) (mem. op.). Texas Property Code section 92.331(a) provides:

> A landlord may not retaliate against a tenant by taking an action described by [s]ubsection (b) because the tenant: (1) in good faith exercises or attempts to exercise against a landlord a right or remedy granted to the tenant by lease, municipal ordinance, or federal or state

---

[29] To the extent that Nowlin asserts that the trial court erred in denying her motion for summary judgment on Keaton's retaliation counterclaim, we note that after a trial on the merits, the denial of a motion for summary judgment may not be reviewed on appeal. *Ackermann*, 403 S.W.2d at 365; *Tricon Tool & Supply*, 226 S.W.3d at 509.

statute[] [or] (2) gives a landlord a notice to repair or exercise a remedy under this chapter.

TEX. PROP. CODE ANN. § 92.331(a).  Section 92.331(b) further provides:

> [The] landlord may not, within six months after the date of the tenant's action under [s]ubsection (a), retaliate against the tenant by:  (1) filing an eviction proceeding, except for the grounds stated by Section 92.332; (2) depriving the tenant of the use of the premises, except for reasons authorized by law; (3) decreasing services to the tenant; (4) increasing the tenant's rent or terminating the tenant's lease; or (5) engaging, in bad faith, in a course of conduct that materially interferes with the tenant's rights under the tenant's lease.

Id. § 92.331(b).

In Question No. 7 of its charge, the trial court asked the jury, related to Keaton's retaliation counterclaim:

> Did LINDA S. NOWLIN retaliate against LORI KEATON?
>
> You are instructed that:
>
> a. A landlord may not retaliate against a tenant by taking an action described under (b) because the tenant:
>    1. in good faith exercises or attempts to exercise against a landlord a right or remedy granted to the tenant by lease, municipal ordinance, or federal or state statute; or
>    2. gives a landlord a notice to repair or exercise a remedy under this chapter.
>
> b. A landlord may not, within six months after the date of the tenant's action under (a), retaliate against the tenant by:

1. filing an eviction proceeding, except as stated below in (c) or (d);
2. increasing the tenant's rent or terminating the tenant's lease; or
3. engaging in bad faith, in a course of conduct that materially interferes with the tenant's rights under the tenant's lease.

c. The landlord is not liable for retaliation if the landlord proves that the action was not for purposes of retaliation.

d. Eviction or lease termination based on the following circumstances, which are valid grounds for eviction or lease termination in any event, does not constitute retaliation.
   1. the tenant is delinquent in rent when the landlord gives notice to vacate or files an eviction action;
   2. the tenant, a member of the tenant's family, or a guest or invitee of the tenant intentionally damages property on the premises.

Answer "Yes" or "No."[30]

The jury answered: "Yes."

In her third amended answer and counterclaims, Keaton alleged, in part, related to her retaliation counterclaim, that after she prevailed in Nowlin's forcible-detainer action, Nowlin, in retaliation, served Keaton with the September 4, 2014 notice to vacate. *See generally Nelson*, 2015 WL 1261953, at *3 (evidence of retaliation where "within a few days of the judgment in [tenant]'s favor in [landlord's] previous eviction action, [landlord] served its third or fourth notice of eviction"); *Holmes v. Al Jaafreh*, Nos. 10-11-00148-CV to 10-11-00154-CV, 01-14-

---

[30] Nowlin raised no objection in the trial court to Question No. 7.

00313-CV, 2013 WL 2395106, at *8 (Tex. App.—Waco May 30, 2013, no pet.) (mem. op.) (tenant asserted landlord retaliated by interrupting tenant's utilities after tenant prevailed in landlord's eviction suit). At trial, the jury heard evidence that Nowlin, on June 4, 2014, filed a forcible-detainer action against Keaton, alleging that Keaton had breached the lease agreement by unreasonably refusing to allow Nowlin or her agents to enter the property to make repairs or perform maintenance and by failing to pay her rent in a timely manner. The jury in Nowlin's forcible-detainer action found, on August 27, 2014, that Keaton had not unreasonably refused to allow Nowlin or her agents to enter the property and that Keaton had not failed to pay her rent in a timely manner. And the trial court entered judgment in favor of Keaton in that case. When asked whether the judgment in the forcible-detainer action stated that "Keaton did not violate the lease [agreement by] paying late or not paying [rent] through August 2014," Nowlin testified, "I believe that's correct."

After the jury rendered its verdict in Nowlin's forcible-detainer action, Nowlin, on September 4, 2014, served Keaton with a notice to vacate. *See generally Nelson*, 2015 WL 1261953, at *3. The September 4, 2014 notice to vacate states, in part:

> Re: TAA Lease Contract dated 4/12/14
> between [Keaton] and Linda Nowlin (owner)[.]
>
> You are in arrears on your rental payments in the amount of $6,300.00.

> Because of your continued violations of the Lease Agreement, including your refusal to provide entry for maintenance upon demand and your non-payment of rent, your residency is terminated effective immediately. You are hereby given notice to vacate the premises before 11:59, p.m., [September] 5, 2014, which is at least one day from the delivery of this notice in accordance with your lease contract. Failure to move out by then will result in an eviction suit being filed against you. Delay or postponement of such action does not waive our rights. You are liable for all rent due under the full term of your contract, damages to the premises, legal fees and any other charges due under the terms of your agreement.

Nowlin argues that "the transmission" of the September 4, 2014 notice to vacate could not "form the basis for a [counter]claim of retaliation" because "it [was] indisputable that [Keaton] was delinquent on rent at least in the amount of $2,100 by that date," making the notice "statutorily exempt from forming the basis of a retaliation claim," and Keaton did not vacate the property because she received the September 4, 2014 notice to vacate.

Here, the jury was charged that an "[e]viction or lease termination" would not constitute retaliation where "[a] tenant [was] delinquent in rent when the landlord g[ave] notice to vacate or file[d] an eviction action." *See* TEX. PROP. CODE ANN. § 92.332(b)(1). However, as previously addressed, in the instant case, the jury heard evidence that Keaton was not delinquent in her rent at the time Nowlin served the September 4, 2014 notice to vacate; in fact, it heard evidence that Keaton had "pa[id] all of the rent that was due under the [lease agreement]" prior to vacating the property. Evidence that Keaton was current on her rent payments at the time that

54

Nowlin served her with the September 4, 2014 notice to vacate negates the exception that an "[e]viction or lease termination" based on the failure to pay rent cannot constitute retaliation. *See generally Nelson*, 2015 WL 1261953, at *3; *cf. Williams v. Hous. Corp. of Greater Hous.*, Civil Action No. H-14-2309, 2016 WL 5795136, at *9 (S.D. Tex. Sept. 16, 2016) (tenant could not prevail on retaliation claim where she offered no evidence to show that she was current in rent payments at the time landlord filed eviction proceeding); *Wilson v. Woodland Hills Apartments*, No. 05-16-01093-CV, 2017 WL 5897900, at *3 (Tex. App.—Dallas Nov. 29, 2017, pet. denied) (mem. op.) (no retaliation where evidence showed tenant delinquent in his rent at time landlord served notice to vacate).

Further, Nowlin argues that her September 4, 2014 notice to vacate could not form the basis of Keaton's counterclaim for retaliation because a notice to vacate can only constitute a termination of a lease agreement if the tenant vacates after receiving the notice and "for that reason." (Emphasis omitted.) Although Nowlin asserts that Keaton did not vacate the property *because* she received the September 4, 2014 notice to vacate, and thus the notice to vacate could not support a counterclaim for retaliation, we note that Nowlin, in her brief, provides no support, authority, or analysis for her conclusory argument.

As previously stated, Texas Rule of Appellate Procedure 38.1(i) requires that an appellant's brief "contain a clear and concise argument for the contentions made,

55

with appropriate citations to authorities and to the record." Tᴇx. R. Aᴘᴘ. P. 38.1(i). "This is not done by merely uttering brief conclusory statements, unsupported by legal citations." *Tesoro Petroleum Corp.*, 106 S.W.3d at 128; *see also Barham*, 803 S.W.2d at 740. A failure to provide substantive analysis of an issue or cite appropriate authority waives a complaint on appeal. *Marin Real Estate Partners*, 373 S.W.3d at 75; *Huey*, 200 S.W.3d at 854; *Cervantes-Peterson*, 221 S.W.3d at 255.

Based on the foregoing, we cannot say that the jury's finding that Nowlin retaliated against Keaton is not supported by more than a scintilla of evidence. Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that Nowlin retaliated against Keaton.

We overrule Nowlin's third issue.

We note that Nowlin, in passing in her brief, asserts that Keaton "failed adequately to allege a [counter]claim for retaliation." To the extent that Nowlin attempts to advance this argument on appeal, we conclude that it is waived. *See* Tᴇx. R. Aᴘᴘ. P. 38.1(i); *Tesoro Petroleum Corp.*, 106 S.W.3d at 128; *see also Huey*, 200 S.W.3d at 854.

**Other Property Code Violations**

In her fourth issue, Nowlin argues that the trial court erred in entering judgment in favor of Keaton on Keaton's counterclaims for violations of Texas

Property Code sections 92.153(a)(3) and (a)(5), 92.157(a)(2), and 92.158 because the evidence shows that Nowlin "installed a keyless bolting device on the [front] door . . . on May 23, 2014" and "all exterior sliding glass doors providing entrance to the [p]roperty were always equipped with security bars" and there is no evidence that Keaton made "written requests for compliance with the [Texas] Property Code, or for repair or installation of any of the security devices."[31] Further, Nowlin asserts that she cannot be held liable for failing to repair the handle latches on the exterior sliding glass doors because the doors all had security bars.

As previously noted, when a party attacks the legal sufficiency of an adverse finding on an issue for which she did not have the burden of proof, she must demonstrate that there is no evidence to support the adverse finding. *See Exxon Corp.*, 348 S.W.3d at 215; *Examination Mgmt. Servs.*, 367 S.W.3d at 839. If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp.*, 960 S.W.2d at 48.

Texas Property Code section 92.153 requires a landlord to equip a dwelling with certain security devices, including "a sliding door pin lock on each exterior

---

[31] To the extent that Nowlin asserts that the trial court erred in denying her motion for summary judgment on Keaton's counterclaims for violations of Texas Property Code sections 92.153(a)(3) and (a)(5), 92.157(a)(2), and 92.158, we note that after a trial on the merits, the denial of a motion for summary judgment may not be reviewed on appeal. *Ackermann*, 403 S.W.2d at 365; *Tricon Tool & Supply*, 226 S.W.3d at 509.

sliding glass door of the dwelling" and "a keyless bolting device . . . on each exterior door of the dwelling." TEX. PROP. CODE ANN. § 92.153(a)(3), (a)(5). If a landlord does not comply with section 92.153, a tenant may "serve a written request for compliance on the landlord, and . . . if the landlord does not comply on or before the third day after the date the notice is received, [the tenant may] file suit against the landlord and obtain a judgment for . . . actual damages[,] . . . a civil penalty of one month's rent plus $500," and attorney's fees. *Id.* § 92.164(a)(4); *Lemus v. Cookscreek 255, LLC*, No. 05-17-01085-CV, 2018 WL 6259480, at, *3 *9 (Tex. App.—Dallas Nov. 30, 2018, no pet.) (mem. op.) (Texas Property Code section 92.164 sets out tenant remedies for a landlord's failure to install security devices listed in Property Code section 92.153); *Hernandez v. Gallardo*, 458 S.W.3d 544, 549 (Tex. App.—El Paso 2014, pet. denied).

Texas Property Code section 92.157 requires a landlord, upon a tenant's request, to install "a sliding door handle latch or sliding door security bar if the door is an exterior sliding glass door without a sliding door handle latch or sliding door security bar." TEX. PROP. CODE ANN. § 92.157(a)(2). Texas Property Code section 92.158 requires a landlord to "repair or replace a security device on request or notification by the tenant that the security device is inoperable or in need of repair or replacement." *Id.* § 92.158. If a landlord does not comply with section 92.157 or section 92.158, a tenant may "file suit against the landlord and obtain a judgment

58

for . . . actual damages[,] . . . a civil penalty of one month's rent plus $500," and attorney's fees. *Id.* § 92.165(3).

In Question No. 8 of its charge, the trial court asked the jury, related to Keaton's counterclaims for violations of Texas Property Code sections 92.153(a)(3) and (a)(5), 92.157(a)(2), and 92.158:

> Did LINDA S. NOWLIN fail to do any of the following within a reasonable time, presumed to be seven days, after receiving a written request?
>
> Answer "Yes" or "No" for each:
>
> a. Install a keyless dead bolt on the main entrance of the premises.
>
> b. Install a sliding door pin lock for any exterior sliding glass door without a sliding door pin lock.
>
> c. Install a sliding door security bar for any exterior sliding glass door without a sliding door security bar.
>
> d. Repair and replace the sliding door handle latch on any exterior sliding glass door.[32]

The jury answered: "Yes" for each.

## A. Keyless Dead Bolt Lock

Nowlin concedes that on May 19, 2014, Keaton requested the installation of a keyless dead bolt lock on the property's front door. Nowlin argues that the evidence is legally insufficient to support the jury's finding that she failed to install

---

[32] Nowlin raised no objection in the trial court to Question No. 8.

a keyless dead bolt lock on the property's front door because the evidence shows that Nowlin "installed a keyless bolting device" and Keaton was required to prove that the lock that was installed by Nowlin did not constitute a keyless dead bolt lock.

Keaton testified that she requested the installation of a keyless dead bolt lock on the front door of the property. However, according to Keaton, the lock that Nowlin's contractors actually installed on the front had a keyhole, which Nowlin "wanted [Keaton] to consider [to be] keyless." In other words, Keaton testified that instead of a keyless dead bolt lock, a "keyed" dead bolt lock was installed on the property's front door. Although Keaton did not have the key for the lock, she explained that the lock had been manufactured with a key. Maughan, a handyman who installed the lock on the front door, testified that the lock that he installed on the door had a keyhole.

Although Nowlin and Maughan also testified that the lock that was installed on the property's front door could not be operated from the outside, and, thus, functioned as a keyless dead bolt lock, the jury, as the fact finder, was the sole judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. And it could choose to believe one witness over another and could resolve inconsistencies in the testimony of any witness. *Id.*; *McGalliard*, 722 S.W.2d at 697.

Further, to the extent that Nowlin asserts that the lock actually installed on the property's front door "constitute[d] a keyless bolting device under the definition provided by" Texas Property Code section 92.151, we note that the trial court, in its charge to the jury, did not define the term "keyless dead bolt," and Nowlin did not object to the lack of a definition. Moreover, the court instructed the jury: "If [the] instructions use a word in a way that is different from its ordinary meaning, use the meaning [that the court] give[s] you, which will be a proper legal definition." Thus, here, we must measure the sufficiency of the evidence against the commonly-understood meaning of "keyless dead bolt." *See Jerry L. Starkey, TBDL, L.P. v. Graves*, 448 S.W.3d 88, 109 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Kroger Co. v. Brown*, 267 S.W.3d 320, 323 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding, when no objection is made to jury issue, sufficiency of evidence is measured against charge given by court rather than some other unidentified law).

As charged, we cannot say that the jury's finding that Nowlin, within a reasonable time after receiving a written request, failed to "[i]nstall a keyless dead bolt on the main entrance of the premises" is not supported by more than a scintilla of evidence. Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that Nowlin failed to install a keyless deadbolt lock.

61

**B.     Pin Locks**

Nowlin appears to concede that she never actually installed any pin locks at the property. However, she argues that the evidence is legally insufficient to support the jury's findings that she, within a reasonable time after receiving a written request, failed to "[i]nstall a sliding door pin lock [on] any exterior sliding glass door without" one, because there is no evidence that Keaton ever made a request for compliance with Texas Property Code section 92.153(a)(3) or a request for the installation of pin locks on any door.

The trial court, in its charge to the jury, did not define the term "request" and Nowlin did not object to the lack of a definition. As noted previously, the trial court instructed the jury: "If [the] instructions use a word in a way that is different from its ordinary meaning, use the meaning [that the court] give[s] you, which will be a proper legal definition." Thus, here, we must measure the sufficiency of the evidence against the commonly-understood meaning of the word "request." *See Graves*, 448 S.W.3d at 109; *Brown*, 267 S.W.3d at 323; *see also Osterberg*, 12 S.W.3d at 55.

The lease agreement stated that Nowlin was required by Texas law to provide pin locks on the exterior sliding glass doors at the property. And Nowlin acknowledged that none of the exterior sliding glass doors had pin locks at the time that she purchased the property.

Keaton, on her inventory and condition form, which she completed at the beginning of the lease term and which Nowlin signed, stated that the exterior sliding glass doors at the property did not have pin locks. And Nowlin conceded that Keaton's inventory and condition form listed items at the property that were damaged or in need of repair.

Further, on June 11, 2014, Keaton sent Nowlin a letter "point[ing] out a lot of the violations that [Nowlin] had committed according to the [Texas] Property Code." Specifically, in that letter, Keaton told Nowlin that she had not "install[ed] a sliding door pin lock on each exterior sliding glass door of the [property]." And Keaton stated, that the June 11, 2014 letter, in addition to the lease agreement, inventory and condition form, was intended to notify Nowlin of that failure.

Moreover, in her July 28, 2014 email to Nowlin, Keaton stated: "*[P]erhaps you might plan services and repairs which are needed*, such as installing a keyless deadbolt on the front door, *locks on the sliding glass doors*, or the light fixture outside the front door. *Those are much more urgent* than termite treatment for a house that has been inspected specifically for termites in the last three months and found to be without termites." (Emphasis added.)

The definition of the word "request," as a verb, is: "[t]o ask for (something); to solicit; to make a request to or of (one); followed by an infinitive." *Byars v. Byars*, 182 S.W.2d 363, 364 (Tex. 1944) (internal quotations omitted). The definition of

63

the word "request," as a noun is: "[a]ct or instance of asking for something or some action desired; expression of desire; entreaty; petition; that which is asked for." *Id.* (internal quotations omitted); *see also Request*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2014) (defining "request" as a verb as "to express a wish or desire for; ask for[;] . . . to ask a person to do something"; defining "request" as a noun as "the act of asking, or expressing a desire, for something").

As charged, we cannot say that the jury's finding that Keaton made a "request" for the "[i]nstall[ation of] a sliding door pin lock for any exterior sliding glass door without a sliding door pin lock" is not supported by more than a scintilla of evidence. Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that Nowlin failed to install a pin lock.

## C.    Security Bars

Nowlin first asserts that Keaton did not adequately plead her counterclaim for failure "to install security bars on certain [exterior] sliding glass doors in violation of [Texas Property Code section] 92.157."

A trial court must submit jury questions that are raised by the written pleadings and the evidence. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992); *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 823 (Tex. App.— Houston [1st Dist.] 1999, pet. denied); *see also* TEX. R. CIV. P. 278. To support submission of a jury question, a party's pleadings must give the opposing party fair

and adequate notice of the facts upon which the pleader relies so that the opposing party has sufficient notice and information to prepare her defense. *Murray v. O & A Express, Inc.*, 630 S.W.2d 633, 636 (Tex. 1982); *Rosenbloom Mach.*, 995 S.W.2d at 823. Thus, in determining whether Keaton's pleadings were sufficient to support a question on Nowlin's failure to install a security bar, we focus on the notice Keaton's pleadings provided Nowlin, and her opportunity to prepare a defense on Keaton's counterclaim that Nowlin violated Texas Property Code section 92.157(a)(2) by failing to install a security bar.

Pleadings must "[c]onsist of a statement in plain and concise language of the [party]'s cause of action." *Willock v. Bui*, 734 S.W.2d 390, 392 (Tex. App.—Houston [1st Dist.] 1987, no writ) (first alteration in original) (internal quotations omitted); *see also* TEX. R. CIV. P. 45(b); *Rosenboom Mach.*, 995 S.W.2d at 823. Fair notice has been given if the pleadings are sufficiently specific so that an opposing party can ascertain from the pleadings the nature and basic issues of the controversy and the probable relevant testimony. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000); *Estate of Menifee v. Barrett*, 795 S.W.2d 810, 812 (Tex. App.—Texarkana 1990, no writ); *see also Rosenboom Mach.*, 995 S.W.2d at 823–24.

Keaton, in her third amended answer and counterclaims, alleged that Nowlin "violated Texas Property Code section 92.157(a)(2) when she refused to comply

with [Keaton]'s June 11, 2014[] request for the installation of a . . . security bar on th[e] exterior sliding glass doors." Further, Keaton pleaded that she sought damages "under Texas Property Code section 92.164(a)(4), in the amount of $7,800, which represents the statutory penalty of one month's rent ($2,100) plus $500[,] multiplied by four doors," and attorney's fees.

Nowlin asserts that Keaton did not "ma[k]e an adequate allegation of liability for failing to install security bars" because she referenced the wrong Texas Property Code section under which she would be entitled to damages. *Compare* TEX. PROP. CODE ANN. § 92.164(a)(4), *with id.* § 92.165(3). However, a pleading may still provide adequate and fair notice to the opposing party even where it refers to the wrong section of a statute. *See Auld*, 34 S.W.3d at 896–97 (party's answer "pleaded sufficient facts to give adequate and fair notice to [opposing party] . . . even though the pleading referred to an incorrect version of the statute"); *Tex. State Bd. of Veterinary Med. Exam'rs v. Giggleman*, 408 S.W.3d 696, 703 (Tex. App.—Austin 2013, no pet.); *see also CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 586 (Tex. App.—Dallas 1991, writ denied) ("A pleading that gives adequate notice will not fail merely because the draftsman named it improperly."). We conclude that Keaton's pleadings provided sufficient notice to Nowlin of Keaton's counterclaim for a violation of Texas Property Code section 92.157(a)(2) by failing to install a security bar.

Nowlin next argues that the evidence is legally insufficient to support the jury's findings that she, within a reasonable time after receiving a written request, failed to "[i]nstall a sliding door security bar for any exterior sliding glass door" that lacked one, because there is no evidence that Keaton ever made a request for compliance with Texas Property Code section 92.157(a)(2) or a request for the installation of a security bar on any exterior sliding glass door.

As previously addressed, because the trial court, in its charge to the jury, did not define the term "request" and Nowlin did not object to the lack of a definition, we measure the sufficiency of the evidence against the commonly-understood meaning of the word "request." *See Graves*, 448 S.W.3d at 109; *Brown*, 267 S.W.3d at 323; *see also Osterberg*, 12 S.W.3d at 55.

The lease agreement stated that Nowlin was required by Texas law to provide either a handle latch or a security bar on each exterior sliding glass door at the property. Keaton, on her inventory and condition form, which she completed at the beginning of the lease term and which Nowlin signed, stated that only two of the upstairs exterior sliding glass doors had security bars. And Nowlin conceded that Keaton's inventory and condition form listed items at the property that were damaged or in need of repair.

Further, on June 11, 2014, Keaton sent Nowlin a letter "point[ing] out a lot of the violations that [Nowlin] had committed according to the [Texas] Property Code."

67

Specifically, in that letter, Keaton told Nowlin that she had not installed "a sliding door security bar on each exterior sliding glass door of the [property]." And Keaton stated, that the June 11, 2014 letter, in addition to the lease agreement and the inventory and condition form, was intended to notify Nowlin of her failure. Nowlin confirmed at trial that Keaton, in her June 11, 2014 letter, had referred to the lack of security bars on the exterior sliding glass doors at the property. Moreover, in a July 28, 2014 email to Nowlin, Keaton notified Nowlin that the "locks on the [exterior] sliding glass doors" were in need of urgent "services and repairs."

As charged, we cannot say that the jury's finding that Keaton made a "request" for the "[i]nstall[ation of] a sliding door security bar for any exterior sliding glass door" is not supported by more than a scintilla of evidence.

Nowlin further argues that the evidence is legally insufficient to support the jury's finding that she failed to "[i]nstall a sliding door security bar for any exterior sliding glass door without a sliding door security bar" because the evidence clearly established that all exterior sliding glass doors were always equipped with security bars, i.e. "a wooden bar or plastic rod that could be placed at the bottom of the interior side of the fixed panel of the door," the pieces of wood or PVC pipe that laid at the bottom of the exterior sliding glass doors constituted security bars as defined by the Texas Property Code, and Keaton admitted on her inventory and condition form that at least two of the sliding glass doors were equipped with security bars.

68

The trial court, in its charge to the jury, did not define the term "security bar," and Nowlin did not object to the lack of a definition. As noted previously, the trial court instructed the jury: "If [the] instructions use a word in a way that is different from its ordinary meaning, use the meaning [that the court] give[s] you, which will be a proper legal definition." Thus, we measure the sufficiency of the evidence against the commonly-understood meaning of the word "security bar." *See Graves*, 448 S.W.3d at 109; *Brown*, 267 S.W.3d at 323; *see also Osterberg*, 12 S.W.3d at 55.

The lease agreement stated that Nowlin was required by Texas law to provide either a handle latch or a security bar on each exterior sliding glass door at the property. With respect to the exterior sliding glass doors on the property, Nowlin testified that the only devices securing the exterior sliding glass doors were pieces of wood or PVC pipe laid at the bottom of the doors. Nowlin stated that she never purchased security bars, such as those available at home improvement stores, for the exterior sliding glass doors because she considered the pieces of wood or the PVC pipe that laid at the bottom of the doors to constitute security bars. However, Nowlin conceded that she was "not sure [whether] placing a PVC pipe in at an angle or a piece of wood" actually secured the exterior sliding glass doors, and she noted that the security bars that would "go across the middle of [a] door" would provide additional security for the property. In fact, Nowlin had actually installed such security bars at other properties that she owned.

69

Further, Nowlin confirmed that Keaton referred to the lack of security bars on the exterior sliding glass doors in her June 11, 2014 letter to Nowlin. And in a July 28, 2014 email to Nowlin, Keaton notified her that the "locks on the [exterior] sliding glass doors" were in need of repair or servicing.

With respect to the exterior sliding glass doors on the property, Keaton testified that there were four—three upstairs and one downstairs—and all of the sliding glass doors lacked appropriate security bars. Although Keaton, on her inventory and condition form, which she completed at the beginning of the lease term, noted that two of the upstairs exterior sliding glass doors had security bars, Keaton testified that at the time that she filled out her inventory and condition form, she did not know what constituted a security bar. Further, Keaton's inventory and condition form only notes, at most, that two of the exterior sliding glass doors at the property had security bars, and it is undisputed that there were more than two exterior sliding glass doors at the property. According to Keaton, Nowlin never installed security bars on the exterior sliding glass doors at the property.

As charged, we cannot say that the jury's finding that Nowlin, within a reasonable time after receiving a written request, failed to "[i]nstall a sliding door security bar for any exterior sliding glass door without a sliding door security bar" is not supported by more than a scintilla of evidence. Accordingly, we hold that the

70

evidence is legally sufficient to support the jury's finding that Nowlin failed to install a security bar.

### D.     Handle Latches

Nowlin first argues that the evidence is legally insufficient to support the jury's finding that she failed to "[r]epair and replace the sliding door handle latch on any exterior sliding glass door" because handle latches were only required to be installed on sliding glass doors that did not already have security bars and all of the sliding glass doors at the property were equipped with security bars. However, contrary to Nowlin's argument, we have already concluded that the evidence is legally sufficient to support the jury's finding that Nowlin failed to "[i]nstall a sliding door security bar." And we note that the trial court's charge to the jury on Question No. 8, to which Nowlin did not object, did not require the jury to find that the exterior sliding glass doors at the property lacked security bars before it could find that Nowlin, within a reasonable time and after receiving a written request, failed to "[r]epair and replace the sliding door handle latch on any exterior sliding glass door."

Nowlin next argues that the evidence is legally insufficient to support the jury's finding that she, within a reasonable time after receiving a written request, failed to "[r]epair and replace the sliding door handle latch on any exterior sliding glass door" because there is no evidence that Keaton ever made a request for

71

compliance with Texas Property Code section 92.158 or a request for the repair of handle latches on any exterior sliding glass door.

As previously addressed, because the trial court, in its charge to the jury, did not define the term "request" and Nowlin did not object to the lack of a definition, we measure the sufficiency of the evidence against the commonly-understood meaning of the word "request." *See Graves*, 448 S.W.3d at 109; *Brown*, 267 S.W.3d at 323; *see also Osterberg*, 12 S.W.3d at 55.

The lease agreement stated that Nowlin was required by Texas law to provide a handle latch or a security bar for each exterior sliding glass door at the property. Keaton, on her inventory and condition form, which she completed at the beginning of the lease term and which Nowlin signed, stated that the handle latches on the upstairs exterior sliding glass doors did not function. And Nowlin conceded that Keaton's inventory and condition form listed items at the property that were damaged or in need of repair.

In regard to the exterior sliding glass doors, Nowlin acknowledged that Keaton told her that the handle latches on the exterior sliding glass doors did not work. And Nowlin affirmed that the inspector, who inspected the property prior to Nowlin's purchase, also notified her that the handle latches on the upstairs exterior sliding glass doors needed to be adjusted and did not function property. The inspector's report states, in part: "The handle locks for all three sliding glass doors

72

along the [west] side of the house need to be adjusted" because the locks do not latch.

Further, on June 11, 2014, Keaton sent Nowlin a letter "point[ing] out a lot of the violations that [Nowlin] had committed according to the [Texas] Property Code." Specifically, in that letter, Keaton told Nowlin that she had not "install[ed] . . . a sliding door handle latch . . . on each exterior sliding glass door of the [property]." And Keaton stated, that the June 11, 2014 letter, in addition to the lease agreement, inventory and condition form, was intended to notify Nowlin of her failure.

Moreover, in her July 28, 2014 email to Nowlin, Keaton stated: "*[P]erhaps you might plan services and repairs which are needed*, such as installing a keyless deadbolt on the front door, *locks on the sliding glass doors*, or the light fixture outside the front door. *Those are much more urgent* than termite treatment for a house that has been inspected specifically for termites in the last three months and found to be without termites." (Emphasis added.)

As charged, we cannot say that the jury's finding that Keaton made a "request" for the "[r]epair and replace[ment of] the sliding door handle latch on any exterior sliding glass door" is not supported by more than a scintilla of evidence. Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that Nowlin failed to repair and replace the handle latch.

We overrule Nowlin's fourth issue.

We note that Nowlin, in passing in her brief, asserts that Keaton "failed adequately to allege a [counter]claim . . . for any violation of [Texas Property Code section] 92.157." To the extent that Nowlin attempts to advance this argument on appeal, we conclude that it is waived. *See* TEX. R. APP. P. 38.1(i); *Tesoro Petroleum Corp.*, 106 S.W.3d at 128; *see also Huey*, 200 S.W.3d at 854.

### Damages and Attorney's Fees

In her fifth issue, Nowlin argues that the trial court erred in awarding Keaton $500 for actual damages because Nowlin did not violate the Texas Property Code and "[a]warding [Keaton] damages based on the cost of her renting a storage pod during her move-out makes sense only if the jury determined that [Keaton] was forced to move out by [Nowlin]." Due to our disposition above, we need not address the first portion of Nowlin's argument. *See* TEX. R. APP. P. 47.1. We hold the remaining portion of Nowlin's fifth issue is waived. *See* TEX. R. APP. P. 38.1(i); *Tesoro Petroleum Corp.*, 106 S.W.3d at 128; *see also Huey*, 200 S.W.3d at 854.

In her sixth issue, Nowlin argues that the trial court erred in awarding Keaton $19,100 in statutory damages because Keaton is not entitled to a judgment in her favor on her counterclaims, including her counterclaims for violations of the Texas Property Code. Nowlin asserts that Keaton's statutory damages "should be reduced to only such damages as are required as a result of the [counter]claims that survive

this appeal." Due to our disposition above, we need not address Nowlin's sixth issue. *See* TEX. R. APP. P. 47.1.

In her seventh issue, Nowlin argues that the trial court erred in awarding Keaton attorney's fees because Nowlin is entitled to judgment in her favor on her claim for breach of lease agreement and Keaton is actually liable to Nowlin for her reasonable and necessary attorney's fees. Due to our disposition above, we need not address Nowlin's seventh issue. *See* TEX. R. APP. P. 47.1.

**Conclusion**

We affirm the judgment of the trial court.


Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.